## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

KEITH S. FAULKNER,                          :
                                            :
                         Plaintiff,         :
                                            :
            v.                              :   Civil Action No. 06-202-MPT
                                            :
MICHAEL J. ASTRUE, Commissioner             :
of Social Security,                         :
                                            :
                         Defendant.         :

## MEMORANDUM OPINION

David J. Lyons, Esquire of the Lyons Law Firm, Wilmington, Delaware.
Counsel for Plaintiff.

Colm F. Connolly, United States Attorney and David M. Chermol, Special Assistant
United States Attorney, United States Attorney's Office, Wilmington, Delaware.
        Of Counsel: Michael McGaughran, Regional Chief Counsel Social Security
Administration and Heather A. Benderson, Assistant Regional Counsel Social Security
Administration, Philadelphia, Pennsylvania.
Counsel for Defendant.

October 9, 2007
Wilmington, Delaware

Thynge, U.S. Magistrate Judge

## I. INTRODUCTION

Plaintiff Keith Faulkner ("plaintiff") filed this action against defendant Michael J. Astrue[1], Commissioner of Social Security ("defendant"), on March 28, 2006. D.I. 1. Plaintiff seeks judicial review, pursuant to 42 U.S.C. § 405 (g), of a decision by defendant denying his claim for disability income benefits under § 216 (I) of the Social Security Act. D.I. 26 at 1. Currently before the court are the parties' cross motions for summary judgment. D.I. 26, 27. For the reasons stated below, the court will deny plaintiff's motion for summary judgment, deny defendant's cross-motion for summary judgment, and remand for further proceedings.

## II. BACKGROUND

### A.   Procedural Background

On September 12, 2003, plaintiff filed an application for disability insurance benefits claiming disability since August 19, 2003.[2] Plaintiff claimed back, neck, and shoulder injuries stemming from a June 14, 2002 work related injury that resulted in a limited ability to lift, sit, stand, bend or twist for long periods of time. The claim was denied initially and upon reconsideration, because it was determined that plaintiff's injuries were not severe enough to keep him from doing other less physically demanding work. Plaintiff requested a hearing before an administrative law judge

---

[1] Michael J. Astrue became the Commissioner of Social Security on February 12, 2007, after this proceeding was initially filed. Pursuant to Rule 25 (d)(1) of the Federal Rules of Civil Procedure, Michael J. Astrue replaced the previous Commissioner of Social Security, Jo Anne B. Barnhart, as defendant in this case.

[2] D.I. 13 at 102.

("ALJ"). The hearing was held on April 14, 2005. On June 7, 2005, the ALJ denied the

plaintiff's claim. The ALJ found the following:

1.    The claimant meets the non-disability requirements for a period of disability and Disability Insurance Benefits set forth in section 216(I) of the Social Security Act and is insured for benefits through the date of this decision.

2.    The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3.    The claimant's degenerative disc disease and recently diagnosed diabetes are considered "severe" based on the requirements in the Regulations 20 CFR § 404.152(c).

4.    These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5.    The undersigned finds the claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the opinion.

6.    The claimant has the residual functional capacity for sedentary[3] and light[4] exertional work, with a sit or stand option every 20 to 20 minutes, requiring low concentration and memory, avoiding climbing, bending, stooping, kneeling, extreme temperatures, hazards, heights, and moving machinery, stair climbing, and vibrations, and allowing him to ambulate to his work place.

7.    The claimant is unable to perform any of his past relevant work (20 CFR § 404.1565).

8.    The claimant is a "younger individual between the ages of 18 and 44" (20 CFR § 404.1563).

9.    The claimant has a "high school (or high school equivalent) education" (20 CFR § 404.1564).

10.    The claimant has no transferrable skills from any past relevant work and/or transferability of skills is not an issue in this case (20 CFR §

---

[3] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 CFR 404.1567(a).

[4] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing or pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 CFR 404.1567(b).

404.1568).

11.   The claimant has the residual functional capacity to perform a significant range of light work (20 CFR § 404.1567).

12.   Although the claimant's exertional limitations do not allow him to perform the full range of light work, using Medical-Vocational Rules as a framework for decision-making, there are a significant number of jobs in the national economy that he could perform.

13.   The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of this decision (20 CFR § 404.1520(g)).

On February 24, 2006, the Appeals Council denied review of the ALJ's

determination, so those findings became the final decision of the Commissioner.

## B.   Plaintiff's Written Submissions to SSA

On September 12, 2003, plaintiff submitted an Application for Disability

Insurance Benefits claiming that his disabling condition prevented him from working

since August 19, 2003.[5] In a supplemental Adult Disability Report dated November 12,

2003, plaintiff claims that back, neck, and shoulder injuries limit his ability to work

because those injuries prevent him from standing, sitting, bending, twisting and lifting.

Plaintiff submitted a Personal Pain Questionnaire dated November 26, 2003,

indicating constant pain specific to the back, neck, right shoulder and left leg. At its

worst, plaintiff describes the pain as excruciating, and distressing when at its least.

Plaintiff claims the pain interferes with his appetite, sleep, work and family life; however,

it has not affected his friendships.

On November 26, 2003, plaintiff also submitted a Daily Activities Questionnaire

indicating that he was first injured on June 14, 2002. In the questionnaire, plaintiff

relates that his morning routine of waking up, getting dressed, and grabbing a paper

---

[5] All facts and medical information referenced herein are found at D.I. 13 and 23.

4

and coffee remained substantially the same as before the injury, except that after the injury, he suffers from constant pain. Plaintiff states that a typical day requires constant shifting from standing/sitting positions to relieve the stress on his back. Plaintiff notes that he is currently unable to take any trips or walks with his family, watch his children practice sports or play games, and mow the lawn or perform other menial household chores.

Plaintiff also states in the questionnaire that he plays chess 3 to 5 times a week, attends NASCAR events once or twice a year, and goes to the beach 2 to 5 times a year, yet he is unable to drive. Plaintiff states that he needs help with these hobbies and activities. For instance, plaintiff claims that when traveling he needs to stop every so often to "move about a little"; he needs help driving and carrying things; and he requires the use of a motorized wheelchair for prolonged walks.

Plaintiff states that his condition prevents him from working because the more physical activity he does, the worse his pain and limitations become, forcing him to lay down, or go to the hospital.

### C.    Facts Evinced at The Administrative Law Hearing

#### 1.    Plaintiff's Testimony

At the ALJ hearing, plaintiff testified that he was working construction when he suffered his initial injury. That injury occurred when plaintiff was demolishing a six foot cast iron pipe. While plaintiff was lifting the pieces of the pipe with another individual to discard them, he suffered a herniated disc. The injury was severe enough that plaintiff was taken to see his employer's doctor at Concentra Medical Center ("Concentra").

Plaintiff testified that a week after going to Concentra, he began physical therapy. During that time, plaintiff felt pain in his lumbar area, and only slight pain in both legs. At that time, plaintiff returned to work on light duty.

Plaintiff testified that prior to his injury he worked as a sheet metal mechanic, which mainly required him to prefabricate duct work and carry it to the job site. That job required constant lifting with the heaviest loads at 30-40 pounds, as well as continuously climbing a ladder to install the ducts. His "light duty" job entailed painting fire hydrants, which required him to carry gallon-size paint cans and accessories to and from the hydrants. Plaintiff worked light duty through the summer of 2002.

Plaintiff was transferred to the night shift where he installed fittings and valves on various lengths of pipe. For such work, plaintiff used a wrench, and the twisting motion aggravated his back which resulted in a second hospitalization.

While hospitalized, plaintiff complained of pain in his left leg, lumbar area, neck, and right shoulder. Shortly thereafter, his employer's doctor, Dr. Kalamchi, as well as his own physician, Dr. Beneck, placed plaintiff off work for approximately three months. Dr. Beneck prescribed physical therapy which failed to provide relief from his symptoms.

Plaintiff testified that in January 2003 he was "forced" to work light duty in an auto shop. His duties there included driving down the street to the auto shop, sweeping the shop and counting parts. Plaintiff described the pain while working in the auto shop as "terrible" and that it affected his entire back, neck, right shoulder and left leg. Plaintiff continued that work until August of 2003, when he began seeing Dr. Moran.

Plaintiff's complaints to Dr. Moran were consistent with his earlier complaints.

6

Although ibuprofen helped control the pain, it did not eliminate it. As a result, Dr. Moran's treatment included pain management sessions. A discogram ordered by Dr. Moran revealed two herniated discs which required a procedure called an "IDET." Plaintiff related that an IDET involved a small incision in his back while a rod is inserted in order to heat up the disc. Plaintiff claims there was no relief from his pain after the IDET.

Plaintiff went off work on September 20, 2003 with complaints of pain in his entire back, neck, left shoulder and left leg. At that time, he was prescribed Percocet, which provided some relief from pain. Although the dosage for Percocet was increased, plaintiff's pain continued to worsen. As a result, he was prescribed morphine. When the morphine did not relieve the pain, plaintiff was prescribed a Duragesic patch, the strength of which had to be periodically increased. In addition, plaintiff was prescribed Relafen, 100mg twice a day for the pain in his left leg and knee, Skelexin, a muscle relaxer and Celexa for depression.

Plaintiff asserts that he constantly needs to change positions to relieve the pain. He can only sit or stand for approximately 20 minutes. When lying down, he must use pillows to elevate his legs. Plaintiff testified that he cannot do any household chores or activities, or watch his children's sports games without having to retreat to his vehicle to lie down. Plaintiff claims that he must do his routine of changing positions from sitting to standing to laying down at family gatherings. He does transport his son to school three days a week which is a five minute drive. Plaintiff has also attempted acupuncture without success and counseling for his chronic pain.

Plaintiff claims to suffer from nine herniated discs, three each in his knee, neck

7

and lumbar spine, a pinched nerve on his left side, numbness in his lower extremities, and a swollen knee.  He currently uses a cane and still undergoes treatment with Dr. Moran.

At the time of the hearing, plaintiff weighed 245 to 250 pounds, and is 5'11" tall.  He is a high school graduate and post-graduation continued his vocational education in the sheet metal and HVAC trades.  After high school, he was employed in a plastic factory.  Subsequently, he worked in a corrugated box factory, construction, then in HVAC and sheet metal work from 1994 until September 2003.  His only income is through workers' compensation (approximately $490.00 per week) which ended in March 2005.[6]

Plaintiff was diagnosed with diabetes in the summer of 2005, which is under control.

## 2.    Debbie Biederman's Testimony

Plaintiff's sister, Debbie Biederman ("Biederman"), testified that, prior to the June 2002 injury, plaintiff played and wrestled with his children, walked the mall with his wife, and was generally active.  After the injury, she noticed a marked difference in his activity level and changes in his social behavior.  She commented that he no longer enjoys family functions.  Biederman testified that plaintiff can no longer attend his children's sporting events or go on family vacations, including short trips.

## 3.    Vocational Evidence

During the administrative hearing, the ALJ called a vocational expert, Tony

---

[6] In February 2005, the company doctor determined that plaintiff could return to work, which resulted in termination of workers' compensation benefits. That termination is presently the subject of other litigation.

8

Melanson, to testify, and asked him the following hypothetical question:

> [A] person who is 39 years of age [INAUDIBLE] has a twelfth-grade
> education in advanced metal work, as indicated, a right-handed individual
> suffering mainly generally from a degenerative disc disease and he has
> some obesity, he indicates he weighs 245 and he indicates in his
> testimony that he was even diagnosed with diabetes in . . . '04, and it
> appears impairments do cause him to have moderate pain and
> discomfort, severe on occasion, he has radiation to the left lower extremity
> and the right shoulder.  The file indicates he has 5/5 strength, somewhat,
> and he also indicates there is some mild depression, he takes some
> medication, but sees no mental health doctors [INAUDIBLE] yet.  His
> conditions are somewhat relieved by medications without significant side
> effects.  He indicates [INAUDIBLE] and tiredness [INAUDIBLE]
> combination and would any jobs, Mr. Melanson, that would allow him to sit
> or stand for 20 or 30 minutes, if he needed that.  Jobs that are low
> concentration and memory due to his pain and discomfort, avoid climbing
> and bending, stooping and kneeling, temperature and humidity extremes
> and moving machinery, heights, stair climbing, vibrations and jobs that
> allow him to ambulate to the workplace [INAUDIBLE] obtained that would
> be able to do sedentary and light work activities with those limitations.  Are
> there jobs out there in the national economy such a person can do in your
> opinion as a vocational expert?

Melanson testified that plaintiff could not return to his past level of work.

Melanson, however, confirmed that jobs, such as a security monitor, machine feeder,

cashier and counter attendant, exist which fall within a light exertional level or are

sedentary, non-skilled positions.  These positions allow a worker the sit/stand option.[7]

Melanson opined that locally, in the northern Delaware region, within a 50 to 70 mile

radius, there are approximately 1,500 cashier positions with 95,000 nationwide; 650

counter attendant positions with 70,000 nationwide; 500 security monitor positions with

---

[7] The sit/stand option is the option by an employee to stand up or sit down while working, either at will
or at set times.

9

65,000 nationwide; and 300 machine feeder positions with 50,000 nationwide.[8]
Melanson testified that those jobs are consistent with plaintiff's skill level according to
the Dictionary of Occupational Titles.

Melanson also opined that severe pain may distract an individual and affect
concentration to the point of preventing substantial meaningful activity.

### D.    Medical Evidence

On July 13, 2002, an MRI of plaintiff's lumbar spine revealed degenerative disc
disease with a central herniation at the L4-L5 level.

On September 27, 2002, plaintiff was treated at Christiana Hospital and was
diagnosed with low back pain and chronic acute exacerbation.  Plaintiff was advised to
return to work and was prescribed Percocet for pain and a muscle relaxer.

On October 11, 2002, x-rays ordered by Dr. Bohatiuk were taken of plaintiff's
cervical, thoracic, and lumbar spine at Midwest Radiology Consultants.  Those x-rays
showed a hypolordotic cervical spine with left lateral head tilt, retrolisthesis of C-2, mild
right towering of the thoracic spine, early mid thoracic and lumbar spondylosis,
increased sacral base angle with anterior weight bearing, and retrolisthesis of L-5.

On October 11, 2002, Dr. Bohatiuk recommended plaintiff stay off work from
October 14, 2002 through October 21, 2002.

On October 24, 2002, Dr. Kalamachi certified that plaintiff has been under his
professional care and would be on disability through November 25, 2002, to be

---

[8] According to Melanson, since the Dictionary of Occupational Titles ("DOT") does not address
whether a particular job allows the option of sitting or standing, based on his education, training and
experience, he reduced the number of available positions by 60-70% to more accurately reflect the
employment market.

reevaluated on that date.

On November 6, 2002,  plaintiff's family physician, Dr. Beneck, put plaintiff on disability from October 31, 2002 through December 5, 2002, with a reevaluation on December 5, 2002.

On December 6, 2002, plaintiff was examined by Dr. Devotta of the Delaware Back Pain and Sports Rehabilitation Center.  In the absence of radicular symptoms, Dr. Devotta recommended a lumbar facet joint block.  If no relief occurred from the block, in light of plaintiff's history of degenerative spinal problems, Dr. Devotta would consider a discography to rule out disc pathology.  A bilateral lumbar facet joint block was administered on January 14, 2003.

On January 23, 2003, plaintiff returned to work with instructions from Dr. Beneck not to lift, push or pull greater than ten pounds, not to bend, lift or twist repetitively, and not to stand or sit for prolonged periods.

On January 30, 2003, plaintiff complained to Dr. Bohatiuk of difficulty with bending, twisting or turning, and continued back, neck, and shoulder pain.  At that time, Dr. Bohatiuk's diagnoses were L4-L5 disc herniation, lumbosacral sprain/strain with radiculitis and R/O radiculopathy, cervical sprain/strain, and thoracic sprain/strain, secondary to the June 14, 2002 work injury.  An EMG/NVC was scheduled and an anti-inflammatory roll-on medication was prescribed.

On January 31, 2003, plaintiff had a followup exam with Dr. Bohatiuk.  Plaintiff's EMG findings were left-sided L5 radiculopathy with acute and chronic changes affecting both the dorsal and ventral rami.  Plaintiff was instructed to maintain proper spine mechanics, avoid improper lifting, carrying, and bending, and remain on a restrictive-

11

duty level of work.

On June 18, 2003, plaintiff was referred to First State Orthopedics by Dr. Bhagat,

his other family doctor. The physical examination by Dr. Rudin, an orthopedic surgeon,

revealed that plaintiff:

> walks with a normal gate and arises easily from a sitting position. He is
> able to heel walk and toe walk bilaterally. He has normal spinal alignment
> and no deformity. He is non-tender to palpation and has no spasm.
> Forward flexion is one foot from the floor, and he arises easily with low
> back pain. Extension is very limited. He has a negative straight leg raise
> bilaterally and no clonus. Reflexes are 2+ and symmetrical. Motor
> examination is 5/5 and equal. Sensory examination is intact.
>
> AP and lateral flexion and extension cervical x-rays at the Spine Center
> demonstrate degenerative disc disease at L4-5 and L5-S1. An MRI
> demonstrates dark disc disease at L4-5 with an annular tear and high
> intensity zone at the same level. This patient's symptoms have gone on
> for a long period of time. He is highly limited. I have ordered a lumbar
> discogram for him . . . His symptoms have lasted essentially a year and I
> do not believe he will significantly respond without any other intervention.

Plaintiff was also examined by Dr. Moran at First State Orthopedics. His

examination revealed a:

> well developed male in no apparent distress, sitting in the examination
> room. Transfers are slow without significant protective posturing. The
> patient does sit with a slight list to his right side. Lumbar flexion was 50%
> normal range with pain in the low and mid back. Right extension rotation
> produced pain at the lumbosacral junction as well as in the thoracic
> paraspinal region bilaterally. The patient was mildly obese. Toe raising
> and heel walking were normal. Motor strength in the lower extremities
> was 5/5 in all muscle tested bilaterally. Sensation was decreased to light
> touch in the left anterior thigh and lateral calf. Pinprick was decreased in
> the left anterior thigh, medial calf and lateral calf. Deep tendon reflexes
> were 2/4 at the knees and ankles bilaterally. Seated straight leg raise
> produced back pain bilaterally. Palpation of the lumbar spine was
> nontender. Shearing through the lumbosacral junction produced some
> deep pain at the lumbosacral junction. There was no gluteal tenderness.

Dr. Moran's impression was probable discogenic low back pain with degenerative disc

disease and a central disc protrusion at the L4-5 level.  Dr. Moran agreed with Dr. Rudin's recommendation for a lumbar discogram and prescribed Vicodin for pain control.

On August 4, 2003, Dr. Rudin advised that the discogram demonstrated severe concordant pain at L4-5 and L5-S1 and recommended continued non-surgical treatment.  As a result, a two level IDET was scheduled for plaintiff.

On October 8, 2003, plaintiff reported to Dr. Moran following the IDET.  Plaintiff's pain remained the same.  Dr. Moran increased the dosage of Percocet and ordered counseling because of plaintiff's depression secondary to low back pain and his employment situation.

On October 29, 2003, an MRI of plaintiff's brain was reported as normal.

On November 5, 2003, plaintiff had another follow-up visit with Dr. Moran. Plaintiff reported that his low back pain was the same following the IDET.  Percocet was continued as it eased his pain. An SSRI was prescribed for depression.  Plaintiff was directed to continue with Skelaxin, and was scheduled to see Dr. Rudin to re-evaluate surgery as an option.  Dr. Moran continued plaintiff on disability and instructed him to stay off work until he saw Dr. Rudin.

On December 10, 2003, Dr. Rudin's notes reflect that plaintiff was doing quite poorly; that the IDET apparently was ineffective; and that surgery was the next option.

On January 5, 2004, plaintiff saw Dr. Rudin to discuss the surgical possibilities. According to Dr. Rudin, plaintiff had not significantly improved and remained essentially disabled.  Dr. Rudin's office notes reflect that plaintiff's pathology is treatable only with surgical intervention, and that plaintiff is totally disabled.

13

On February 25, 2004, plaintiff advised that he wanted surgery, since his low back pain remained unchanged and all conservative efforts for pain relief had been unsuccessful.

From February 25, 2004 through January 6, 2005, plaintiff had six follow up visits with Dr. Moran. At each visit, plaintiff was told to remain on disability pending the next office visit. No progress notes or evaluations accompanied those findings of disability.

On March 18, 2004, at the request of defendant, plaintiff was examined by Irwin Lifrak, M.D., Esq. ("Lifrak"). Lifrak opined that within an eight hour day, taking the usual and customary breaks, plaintiff would be able to walk either indoors or outdoors, climb stairs, sit for a total period of 6-7 hours, stand for a period of 6 hours and lift up to 20 pounds with either hand on a regular basis.

Lifrak based his opinion on the following observations:

> plaintiff was an adequately developed, nourished male with no acute physical distress; plaintiff exhibited a minimal limp favoring his left lower extremity; he got on and off the examining table without difficulty; and he could walk on both heels and toes, and pick up small objects, such as pins and coins, without any dexterity issues.

Although plaintiff's range of motion was reduced in the lumbosacral spine area, there was no evidence of muscle spasm on palpatation. Lifrak's impression was degenerative joint disease and possible disc damage, which would explain the pain plaintiff was experiencing.

On March 31, 2004, a Delaware Disability Services physician reviewed plaintiff's medical records and completed a residual functional capacity assessment ("RFC"). The RFC revealed that plaintiff was able to lift 10 pounds frequently and 20 pounds occasionally, stand at least 2 hours and sit at least 6 hours in an 8 hour day, with

14

unlimited push/pull capacity. Because of pain, the assessment indicated that plaintiff would have occasional limitations with climbing, balancing, stooping, kneeling, crouching and crawling. The RFC recommended that plaintiff avoid concentrated exposure to extreme cold, vibration and hazards, such as machinery, as they may increase his pain, but it did not limit exposure to extreme heat, wetness, humidity, noise and fumes. Finally, the assessment noted that plaintiff has a medically determinable impairment; the impairment is only partially proportionate to the severity and duration of plaintiff's symptoms; and the impairment is partially consistent with the medical and non-medical evidence regarding the activities of plaintiff. The report also addressed plaintiff's weight and reduced his residual functional capacity to sedentary based on near morbid obesity.

On June 17, 2004, a second residual functional capacity assessment was conducted. The differences in the second report from the first assessment were that plaintiff could stand or walk for 6 hours in an 8 hour day; the only environmental limitation was machinery hazards; and plaintiff's residual functional capacity was improved to light duty.

On June 14, 2004, an x-ray of plaintiffs leg showed the knee joint as unremarkable, with cortical thickening posterior to the distoral femoral metaphysis.

On June 21, 2004, an MRI of plaintiff's spine showed small disc protrusions on the left at T5-T6, T6-T7, and T7-T8 with no evidence of cord compression or significant foraminal stenosis.

On July 7, 2004, an imaging study was taken of plaintiff's feet which revealed no abnormalities in either foot.

On October 20, 2004, plaintiff underwent an MRI of his lumbar spine.  The MRI had normal findings, except for small right central disc protrusion at L4-L5 with mild central canal narrowing.

On January 6, 2005, Dr. Moran completed a Medical Impairment Evaluation of plaintiff.  The evaluation states that plaintiff has chronic, continuous discogenic low back pain, with moderate severity, that began on June 14, 2002.  It advises that plaintiff working at his former job or a similar job would worsen his condition and that repetitive bending or lifting, and prolonged sitting or standing aggravates his condition.  It further stated that plaintiff is awaiting cardiac clearance for spinal fusion surgery, as conservative treatment, IDET, and injections have failed.  The report limits plaintiff's ability to sit, stand or walk for one continuous hour, and recommends that plaintiff should not use his hands or arms for pushing or pulling, or his legs to operate foot controls.  The report indicates that plaintiff's condition is disabling.

On March 28, 2005, Dr. Moran prescribed plaintiff a cane.

### III.  Standard of Review

"The court[9] shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.  The findings of

---

[9] "Any individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision or within such further time as the Commissioner of Social Security may allow. Such action shall be brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business, or, if he does not reside or have his principal place of business within any such judicial district, in the District Court of the United States for the District of Columbia [United States District Court for the District of Columbia]." 42 U.S.C. § 405 (g) (2002).

the Commissioner of Social Security as to any fact, if supported by substantial

evidence, shall be conclusive." 42 U.S.C. § 405 (g) (2002); 5 U.S.C. § 706 (E) (1999);

*see Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986).

"'Substantial evidence is more than a mere scintilla. It means such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion.' It

'must do more than create a suspicion of the existence of a fact to be established . . . it

must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the

conclusion sought to be drawn from it is one of fact for the jury.'" *Universal Camera*

*Corp. v. NLRB*, 340 U.S. 474, 477 (1951); *citing Consolidated Edison Co. v. NLRB*, 305

U.S. 197, 229 (1938).

The Supreme Court has embraced a similar standard for determining summary

judgment pursuant to Fed. R. Civ. P. 56:

> The inquiry performed is the threshold inquiry of determining whetherthere
> is the need for a trial - whether, in other words, there are any genuine
> factual issues that properly can be resolved only by a finder of fact
> because they may reasonably be resolved in favor of either party.
>
> Petitioners suggest, and we agree, that this standard mirrors the standard
> for a directed verdict under Federal Rule of Civil Procedure 50(a), which is
> that the trial judge must direct a verdict if, under the governing law, there
> can be but one reasonable conclusion as to the verdict. If reasonable
> minds could differ as to the import of the evidence, however, a verdict
> should not be directed.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986).

"Overall this test is deferential, and we grant similar deference to agency

inferences from facts if those inferences are supported by substantial evidence, even

17

where this court acting de novo might have reached a different result". *Monsour Med. Ctr.*, 806 F.2d at 1190. Furthermore, "the evidence must be sufficient to support the conclusion of a reasonable person after considering the evidentiary record as a whole, not just the evidence that is consistent with the agency's finding." *Monsour Med. Ctr.*, 806 F.2d at 1190. Thus, "a single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence." *Morales v. Apfel*, 225 F.3d 310 (3d Cir. 2000). "Nor is evidence substantial if it is overwhelmed by other evidence - particularly certain types of evidence (e.g., that offered by treating physicians) - or if it really constitutes not evidence but mere conclusion" *Id.*

Where, for example, the countervailing evidence consists primarily of claimant's subjective complaints of disabling pain, the ALJ "must consider the subjective pain and specify his reasons for rejecting these claims and support his conclusion with medical evidence in the record." *Matullo v. Brown*, 926 F.2d 240, 245 (3d Cir. 1990).

## IV. Discussion

### A.    Disability Determination Process

Title II of the Social Security Act, 42 U.S.C. § 423 (a) (1) (D), "provides for the payment of insurance benefits to persons who have contributed to the program and who suffer from a physical or mental disability." *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). A disability is defined as "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a

continuous period of not less than 12 months." 42 U.S.C. § (d) (1) (A) (2002).

In *Plummer v. Apfel*, 186 F.3d 422 (3d Cir. 1999), the Third Circuit outlined the

appropriate test for determining whether a disability exists:

> In order to establish a disability under the Social Security Act, a claimant must demonstrate there is some "medically determinable basis for an impairment that prevents him from engaging in any 'substantial gainful activity' for a statutory twelve-month period." A claimant is considered unable to engage in any substantial activity only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.
>
> The Social Security Administration has promulgated regulations incorporating a sequential evaluation process for determining whether a claimant is under a disability. In step one, the Commissioner must determine whether the claimant is currently engaging in substantial gainful activity. If the claimant is found to be engaged in substantial activity, the disability claim will be denied. In step two, the Commissioner must determine whether the claimant is suffering from a severe impairment. If the claimant fails to show that her impairments are "severe", she is ineligible for disability benefits.
>
> In step three, the Commissioner compares the medical evidence of the claimant's impairment to a list of impairments presumed severe enough to preclude any gainful work. If a claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five. Step four requires the ALJ to consider whether the claimant retains the residual functioning capacity to perform her past relevant work. The claimant bears the burden of demonstrating an inability to return to her past relevant work.

*Plummer*, 186 F.3d at 427-28. If the ALJ determines that a claimant is either disabled

or not disabled at any step in the sequence, the analysis stops. *See* 20 C.F.R. §

404.1520 (a) (2002).

## B.   Application of the Five-Step Test

In the instant matter, the only step at issue is step five, where the Commissioner

has the burden of showing that the claimant is capable of performing work and is not disabled. The first four steps are not contested, as the ALJ determined that: (1) claimant has not engaged in substantial gainful activity since the alleged onset of disability; (2) the claimant's degenerative disc disease and recently diagnosed diabetes are "severe"; (3) claimant's medically determinable impairments do not meet or equal one of the listed impairments presumed severe enough to preclude any gainful work, and; (4) the claimant is unable to perform any of his past relevant work. The only issue raised by plaintiff on appeal is whether the ALJ erred in concluding that defendant carried its burden in determining that plaintiff was not disabled and is able to perform other work existing in the national economy.

The ALJ found that the plaintiff has the residual functioning capacity to perform a significant range of light work, and therefore, sedentary work by default, and although plaintiff's exertional limitations do not allow him to perform the full range of light work, using the Medical-Vocational Rules as a framework, there are a significant number of jobs in the national economy that he could perform.

## C.   Plaintiff's Contentions

Plaintiff challenges the decision of the ALJ on various grounds. Plaintiff argues that the ALJ gave substantial credit to the state physicians, yet did not give due consideration to other medical evidence, namely the opinions of plaintiff's treating physicians. More significantly, plaintiff claims that the ALJ failed to consider Dr. Moran's January 6, 2005 report submitted prior to the hearing, which states that plaintiff has been totally disabled since August 2003. Plaintiff also argues that the ALJ failed to

20

fully and correctly evaluate the vocational expert's opinion and that the ALJ failed to discuss all of the evidence in the record, including the testimony of plaintiff's sister. Finally, plaintiff argues that the Appeals' Council failed to adequately discuss its reason for rejecting Dr. Balu's[10] opinion of August 8, 2005, proffered on appeal concerning plaintiff's ongoing disability, as well as, failing to respond substantively to plaintiff's November 6, 2005 Appellate Letter Memorandum. As such, plaintiff asks the court to reverse with an order that benefits be immediately awarded, or in the alternative, that the case be remanded for complete consideration of the evidence, including Dr. Moran's January 6, 2005 evaluation and Dr. Balu's August 8, 2005 evaluation.

## D.    Weight Given to Treating Physicians

"'A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight." *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000). "Where a treating source's opinion on the nature and severity of a claimant's impairment is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record,' it will be given 'controlling weight.'" *Fargnoli v. Massanari*, 247 F.3d 34, 43 (3d Cir. 2001). "Where . . . the opinion of a treating physician conflicts with that of a non-treating, non-examining physician, the ALJ may choose whom to credit but 'cannot reject evidence for no reason or the wrong reason.'" *Morales*, 225 F3d at 317 (citing *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999)). "The ALJ must consider the medical findings that support a treating physician's opinion that the claimant is

---

[10] Dr. Balu is a physician who began treating plaintiff around the time of the ALJ hearing.

disabled." *Id.* If the ALJ rejects the treating physician's assessment, the ALJ, may not make "speculative inferences from medical reports" and may reject "a treating physician's opinion outright only on the basis of contradictory medical evidence." *Plummer*, 186 F.3d at 429.

Plaintiff's main contention, and the thrust of his appeal, is that the ALJ failed to give due weight to plaintiff's treating physicians. Specifically, plaintiff asserts that the ALJ failed to consider the January 6, 2005 medical evaluation by Dr. Moran.

Defendant counters that the January 6, 2005 report is essentially a cumulative overview of Dr. Moran's previous assessments of plaintiff. Because the ALJ took into account Dr. Moran's previous assessments and gave them their due attention, there is no need to specifically mention the January 6, 2005 opinion, as it contains nothing new. Further, defendant argues that Dr. Moran's opinions are not controlling because they are contradicted by evidence in the record and discredited by Dr. Lifrak and two state agency physicians.

The ALJ found that plaintiff has medically determinable impairments that could be the reason for some of his symptoms. The ALJ stated that he had "reservations, however, as to whether the claimant's assertions concerning his impairments and their impact on his condition, can be fully credible." D.I. 13 at 20. Specifically, the ALJ noted that the "record fails to provide any objective medical evidence that the claimant's impairments are as severe as his hearing testimony indicates." D.I. 13 at 20. The ALJ apparently was seeking some indication of "hospitalizations, significant active treatment or significant office care other than for limited routine maintenance." *Id.* at 20. Further,

22

the ALJ emphasized that there had been no significant increases or changes in plaintiff's prescribed medications. The ALJ determined that the record indicated only limited and conservative treatment of plaintiff's impairments, and his stated daily activities undermined the level of work-related impairments alleged. *Id.* The ALJ concluded that there was no convincing evidence after August 2002 suggesting that plaintiff was unable to work for a period of more than one year. *Id.* Essentially, the ALJ found that plaintiff's testimony was not credible and that plaintiff had an RFC indicating that he could perform light exertional work. Nowhere in his opinion does the ALJ mention Dr. Moran's January 6, 2005 report.

The court, however, disagrees with the determination of the ALJ that the record is void of any evidence supporting plaintiff's complaints. Dr. Moran's unmentioned report of January 6, 2005 evidences that plaintiff has chronic discogenic back pain of moderate severity, which has been disabling since June 14, 2002. That report advises that plaintiff's medical condition has not improved since the impairment first developed. The report opines that plaintiff suffers from decreased lumbar range of motion, decreased sensation in left lower extremity, pain shearing through the lumbar spine, a positive discography at L4-5 and L5-S1, and decreased memory and concentration.

Further that report is from plaintiff's treating physician. The conclusions of Dr. Moran that plaintiff suffers from a disabling condition is the product of over a year and a half of consistent evaluations and treatment. Dr. Moran's opinions are further supported by objective findings, including an EMG which was positive for L5 radiculopathy on the left, an MRI of the lumbar spine showing degenerative disc

23

disease at L4-5, and a discography that was positive for tears and concordant pain at L4-5 and L5-S1. Although Dr. Moran's findings should not be given "controlling weight", they are still afforded great weight. Without mentioning that report, the court does not know if it was given any weight at all. In light of the significance of the report, the ALJ should have addressed it and provided a reason for rejecting it.

Moreover, the report creates conflicting probative evidence between a treating physician, and that of a non-treating, non-examining physician. The most notable inconsistencies are between Dr. Moran's findings and the RFC determinations of the state physicians, which go directly to the issue of plaintiff's ability to do light work.

For instance, Dr. Moran's report indicates that plaintiff should not be using either of his hands for any pushing or pulling activity and should not be operating any foot or leg controls. In contrast, the state physician's RFC of June 13, 2004 allows unlimited pushing, pulling, and operation of foot or leg controls. Dr. Moran's report limits plaintiff's ability to sit, stand or walk for one continuous hour in an eight hour work day. The state RFC posits that plaintiff could sit, stand or walk, with normal breaks, for about six hours in an eight hour day. Moreover, Dr. Moran clearly notes that any repetitive bending, lifting, sitting or standing will aggravate plaintiff's condition. Such conclusions are in direct contradiction of the ALJ's determination that plaintiff is able to do light work. Work is considered "light" when it requires "a good deal" of walking or standing, or when it involves sitting, frequent pushing, pulling, or using arm and leg controls. 20 CFR 404.1567. Dr. Moran's report clearly advises against a "good deal of walking or standing", and strictly prohibits any pushing, pulling, or use of leg controls. It is

24

unknown, however, whether the ALJ considered that evidence, and if considered, why it was rejected. The ALJ simply states that the evidence of record does not support plaintiff's subjective complaints, and that he has an RFC authorizing light work.

Another contradiction to the ALJ's conclusion that plaintiff is capable of light duty is the March 31, 2004 RFC which reduced plaintiff's work ability from light to sedentary because of morbid obesity and L5 pathology that caused pain.

The ALJ's conclusion also directly conflicts with other medical records. Dr. Beneck restricted plaintiff's activities after January 1, 2003 to no lifting, pulling, or pushing of greater than 10 pounds, no repetitive bending, twisting, or lifting, and no prolonged static standing or sitting.

Dr. Rudin's June 18, 2003 report states that plaintiff is "highly limited" and that his impairments have continued approximately a year. Further, plaintiff was placed on disability due to lack of improvement in his low back pain following an IDET. During a subsequent office visit, Dr. Rudin found that plaintiff was doing poorly with no relief of pain through the IDET. Plaintiff appeared incapable of living with the pain and considered surgery.

Moreover, on January 5, 2004 Dr. Rudin noted that plaintiff was totally disabled. Subsequent clinical updates by Drs. Rudin and Moran determined plaintiff as totally disabled from February 25, 2004 through January 6, 2005.

Such evidence suggests that plaintiff is very limited in his daily and work activities, has not improved in almost three years, has experienced constant pain of moderate severity, is morbidly obese, and has remained essentially or totally disabled

25

since his injury. In light of the fact that this evidence comes primarily from plaintiff's treating physicians, it should be given great weight.

The ALJ, however, either fails to address such evidence or fails to provide any reason for discounting it. He merely finds that there was no objective medical evidence presented at the hearing which supports plaintiff's claims. Although a treating physician's mere assertion that plaintiff is disabled is not dispositive, the ALJ must weigh the relative worth of the treating physician's findings and conclusions to those of other physicians. *Adorno v. Shalala*, 40 F.3d 43, 48 (3d Cir. 1994). It is unknown whether the ALJ considered any evidence from plaintiff's treating physicians.

The record contains conflicting probative evidence. "Where there is conflicting probative evidence in the record, we recognize a particularly acute need for an explanation of the reasoning behind the ALJ's conclusions, and will vacate or remand a case where such an explanation is not provided." *Fargnoli v. Halter*, 247 F.3d 34, 42 (3d Cir. 2001). The ALJ does not provide the reasoning behind his conclusions. The ALJ cites to an absence of evidence in the record, but does not address the conflicting evidence. "Although the ALJ may weigh the credibility of the evidence, he must give some indication of the evidence that he rejects and his reasons for discounting that evidence." *Id.* at 43. In the instant matter, the ALJ fails to indicate the evidence he has rejected, and provides no reasons for ignoring that evidence. An ALJ must "consider and explain his reasons for discounting all of the pertinent evidence before him in making his residual functional capacity determination." *Burnett v. Comm'r of Soc. Sec. Admin.* 220 F.3d 112, 121 (3d. Cir. 2000). From the decision, it is impossible to

26

determine what evidence the ALJ considered in reaching his conclusions and why he ignored any evidence.

### E. Vocational Expert

Plaintiff also contends that the ALJ failed to analyze the vocational expert's testimony and ignored cross examination questions that undermined his testimony. The thrust of his argument concerns the vocational expert's testimony that the Dictionary of Occupational Titles ("DOT") does not consider a sit/stand option as a factor. The vocational expert based his opinion on his experience rather than a set formula in DOT. Plaintiff, therefore, maintains that the vocational expert's estimated number of jobs that would have a sit/stand option are unreliable. Plaintiff relies on SSR 00-4P which requires the ALJ to "identify and obtain a reasonable explanation for any conflicts between occupational evidence provided by VE's or VS's and information in the *Dictionary of Occupational Titles* including its companion publication, the *Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles.*"

The testimony of a vocational expert does not bind the ALJ and is merely a tool available to determine whether a claimant's work skills are transferrable to other occupations and the specific occupations where they can be applied. 20 CFR 404.1566. Contrary to plaintiff's argument, the testimony of Melanson, the vocational expert, and the information in DOT are not in conflict. DOT does not address whether a job allows an employee to sit or stand. It only covers how much sitting or standing a particular occupation requires. As a vocational expert, Melanson was qualified based

on his education, training and experience to opine about the employment market.[11]
Further, SSR 00-4P does not limit a vocational expert's opinion solely to DOT. The
explanation provided by Melanson regarding the availability of the sit/stand option is
reasonable, upon which the ALJ could rely.

### F.    Testimony of Biederman

Plaintiff argues that the ALJ ignored the testimony of Biederman, which
corroborated his severe pain. Her non-medical testimony was based on the
observations of plaintiff and his complaints to her. She could not provide medical
information, conclusions, or opinions, so her testimony is arguably addressed by the
ALJ through his finding of no objective medical evidence. The ALJ, however, fails to
address her testimony, therefore, it is unknown whether he considered or rejected it.

### G.    Dr. Balu's August 8, 2005 Report

Plaintiff's final contention is that the court should consider an August 8, 2005
medical assessment by Dr. Balu that was submitted for the first time to the Appeal's
Council, and was not part of the record reviewed by the ALJ. Where a claimant proffers
evidence to the district court that was not before the ALJ, the district court may remand
for reconsideration of that evidence. *Matthews v. Apfel*, 239 F.3d 589, 592 (3d Cir.
2001). Any remand for reconsideration of new evidence is governed by 42 U.S.C. §
405(g), which provides that such evidence must be "new" and "material". Furthermore,
good cause must be shown as to why the evidence was not "incorporated into the
administrative record" before the ALJ. *Id.*

---

[11] Plaintiff does not dispute Melanson's qualifications.

The district court does not have the authority to review the Appeals' Council decision and can not rely on evidence that was never presented to the ALJ under the substantial evidence standard. *Id.* at 593. The district court may remand to the ALJ for consideration of new evidence only where "the claimant has shown good cause why such new and material evidence was never presented to the ALJ." *Id.* at 594. The purpose of the good cause requirement is to prevent claimants from withholding evidence from the ALJ with the hope of securing remand by the district court, should the ALJ deny their claim. *Id.* at 595.

The hearing before the ALJ occurred on April 14, 2005. The record was kept open by the ALJ for a period of seven days, through April 21, 2005. Plaintiff first saw Dr. Balu on April 19, 2005, and thereafter, had monthly appointments with him. Dr. Balu prepared a medical assessment on August 8, 2005. However, there is no indication why plaintiff did not request the record be kept open until a medical assessment could be obtained from Dr. Balu. After the ALJ's decision, plaintiff appealed to the Appeals' Council. In a letter from plaintiff's counsel, the medical assessment from Dr. Balu was submitted to the Appeals' Council. The Appeals' Council made that additional evidence part of the record. The council declined review of the ALJ's determination, as well as Dr. Balu's medical assessment. Plaintiff requests that the court remand the instant matter to the ALJ or the Appeals' Council for reconsideration, including Dr. Balu's medical assessment. For the following reasons, the court declines to make the August 8, 2005 assessment part of the record on remand.

29

While the court believes that there is an argument that this evidence is both new and material, plaintiff fails to provide any explanation or argument why the evidence could not have been presented to the ALJ. Although plaintiff first saw Dr. Balu a few days after the ALJ hearing, it is not clear why plaintiff did not request a postponement or continuation of the hearing. Plaintiff did not identify Dr. Balu as a treating healthcare provider or request an extension to provide additional medical evidence. Therefore, since good cause has not been shown, the August 8, 2005 evaluation by Dr. Balu is not part of the record on remand.

## V. Conclusion

Therefore, summary judgment will be denied for both parties and the case remanded. On remand, the ALJ shall consider and make specific findings as to all relevant probative medical evidence, including assessing the credibility of the evidence, weighing that evidence, and providing reasons for discounting any evidence. An order consistent with this opinion shall follow.

30